UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 24-0552 JGB (SPx)** | Date | June 6, 2025 |
|---|---|---|---|
| Title | *Omar Bolanos and Caren Luke v. Crossroads Equipment Lease and Finance, LLC* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) GRANTING Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (Dkt. No. 48); and (2) VACATING the June 9, 2025 Hearing (IN CHAMBERS)

Before the Court is Plaintiffs' unopposed motion for preliminary approval of class action settlement. ("Motion," Dkt. No. 48.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of the Motion, the Court **GRANTS** the Motion and **VACATES** the June 9, 2025 hearing.

## I.   BACKGROUND

On March 14, 2024, plaintiff Omar Bolanos ("Bolanos") filed a class action complaint against defendant Crossroads Equipment Lease & Finance, LLC ("Crossroads" or "Defendant"). (Dkt. No. 1.) Thereafter, plaintiff Caren Luke ("Luke") filed a class action complaint against Crossroads in this Court. (Dkt. No. 17-1 at ¶ 1.) On April 15, 2024, the Parties filed their joint motion to consolidate the two cases. (Dkt. No. 17.) On April 22, 2024, this Court granted the joint motion to consolidate. (Dkt. No. 19.)

On May 7, 2024, Bolanos and Luke (collectively, "Plaintiffs") filed a consolidated complaint. ("Complaint," Dkt. No. 22.) The operative Complaint alleges ten causes of action: (1) Negligence; (2) Negligence per se; (3) Breach of Implied Contract; (4) Invasion of Privacy; (5) Breach of Fiduciary Duty; (6) Unjust Enrichment; (7) Violation of the California Unfair Competition Law ("UCL"); (8) Violation of the California Consumer Privacy Act; (9) Violation of the California Consumer Records Act; and (10) Declaratory Judgment. (Id.) On June 27, 2024, Defendant answered. ("Answer," Dkt. No. 25.)

On November 14, 2024, the parties filed a joint notice of settlement. ("Notice," Dkt. No. 40.) On March 21, 2025, Plaintiffs filed this unopposed Motion for preliminary approval of class settlement. (See Motion.) In support of the Motion, Plaintiffs filed the following documents:

- Proposed class action settlement agreement (the "Agreement" or "S.A.," Dkt. No. 49-1);
- Declaration of Cameron R. Azari regarding the proposed notice plan ("Azari Decl.," Dkt. No. 49-2); and
- Joint declaration of Scott Edelsberg and Raina Borrelli ("Plaintiffs' Counsel Decl.," Dkt. No. 50).

## II.     FACTUAL ALLEGATIONS

Crossroads is a transportation equipment leasing company based in California. (Motion at 2.) Plaintiffs allege that Crossroads experienced a ransomware attack (the "Security Incident") on or around April 1, 2023, which exposed the personal identifiable information ("PII") of Crossroads' current and former customers (the "Class" or "Class Members"). (Id.) Approximately eleven months after the Security Incident, Crossroads issued notice to Plaintiffs and Class Members. (Id.) In total, the Security Incident impacted 24,182 Class Members. (Id.) Plaintiffs alleged that the types of PII exposed included, inter alia, names, dates of birth, addresses, phone numbers, email addresses, Social Security numbers, driver's license numbers, passport numbers, government ID numbers, vehicle information, loan applications, tax documents, credit reports, financial account information, medical information, and bankruptcy filings. (Id.)

## III.    LEGAL STANDARD

Approval of a class action settlement requires certification of a settlement class. La Fleur v. Med. Mgmt. Int'l, Inc., 2014 WL 2967475, at *2–3 (C.D. Cal. June 25, 2014) (internal quotation marks omitted). A court may certify a class if the plaintiff demonstrates the class meets the requirements of Federal Rules of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b).[1] See Fed. R. Civ. P. 23; see also Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996). Rule 23(a) contains four prerequisites to class certification: (1) the class must be so numerous that joinder is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims of the class representative must be typical of the other class members; and (4) the representative parties must fairly and adequately protect the interests of the class. See Fed. R. Civ. P. 23(a). Rule 23(b) requires one of the following: (1) prosecuting the claims of class members separately would create a risk of inconsistent or prejudicial outcomes; (2) the party opposing the class has acted or refused to act on grounds that apply

---

[1] All references to "Rule" in this Order refer to the Federal Rules of Civil Procedure unless otherwise noted.

generally to the class, so that final injunctive or declaratory relief benefitting the whole class is appropriate; or (3) common questions of law or fact predominate so that a class action is superior to another method of adjudication.  Fed. R. Civ. P. 23(b).

Class action settlements must be approved by the court.  See Fed. R. Civ. P. 23(e).  At the preliminary approval stage, the court "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms."  Id.  "The settlement need only be potentially fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval."  Acosta v. Trans Union, LLC, 243 F.R.D. 377, 386 (C.D. Cal. 2007) (emphasis in original).  To determine whether a settlement agreement is potentially fair, a court considers the following factors: the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.  Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003).

## IV. CONDITIONAL CERTIFICATION OF THE PROPOSED SETTLEMENT CLASS

The parties seek certification of the proposed settlement class for purposes of the Agreement.  (Motion at 7-12.)  The Agreement defines the proposed settlement class as follows: "all individuals residing in the United States to whom Defendants sent a notice concerning the Security Incident."  (Agreement ¶ 1.34.)  The Court first addresses the Rule 23(a) requirements, then turns to the Rule 23(b) requirements.

### A. Requirements of Rule 23(a)

#### 1. Numerosity

A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable.  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  To be impracticable, joinder must be difficult or inconvenient, but need not be impossible.  Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012).  There is no numerical cutoff for sufficient numerosity, but 40 or more members will generally satisfy the numerosity requirement.  Id.  A plaintiff has the burden to establish that this requirement is satisfied.  United Steel, Paper & Forestry, Rubber, Mfg. Energy v. Conoco Phillips Co., 593 F.3d 802, 806 (9th Cir. 2010).  Here, the proposed settlement class includes an estimated 24,182 individuals ("Settlement Class Members"). (Motion at 9.)  Accordingly, the Court concludes that the numerosity requirement is satisfied.

//
//
//

### 2. Commonality

The commonality requirement is satisfied when plaintiffs assert claims that "depend upon a common contention . . . capable of classwide resolution—which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

Here, Plaintiffs and Settlement Class Members share common questions of law and fact arising from the same common event (i.e., the Security Incident that impacted Crossroads in April 2023). (Motion at 9.) See, e.g., In re 23andMe, Inc. Customer Data Sec. Breach Litig., 2024 WL 4982986, at *13 (N.D. Cal. Dec. 4, 2024) (finding that "[c]ommon questions exist because the [class members] were subject to the same data breach; plus, there are common questions related to the breach such as whether [defendant] could have had better security policies to protect [class member] information"); In re PostMeds, Inc. Data Breach Litig., 2024 WL 4894293, at *3 (N.D. Cal. Nov. 26, 2024) (finding commonality satisfied in a data breach class action). Accordingly, Plaintiffs have established commonality.

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff, and whether other class members have been injured by the same course of conduct." Wolin v. Jaguar Land Rover No. Am., 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting Hanon, 976 F.2d at 508). Because typicality is a permissive standard, the claims of the named plaintiffs need not be identical to those of the other class members. Hanlon, 150 F.3d at 1020.

Here, Plaintiffs' and Settlement Class Members' claims arise from the same nucleus of facts—the Security Incident that impacted Crossroads in April 2023—and are based on Defendant's same allegedly unlawful conduct and policies. (Motion at 9-10); see also In re 23andMe, 2024 WL 4982986, at *13 ("Plaintiffs' claims are typical of the class claims because they were subject to the same data breach[.]"); In re PostMeds, 2024 WL 4894293, at *3 (finding typicality satisfied in a data breach class action). Accordingly, the Court is satisfied that Plaintiffs have met the typicality requirement.

### 4. Adequacy

In determining whether a proposed class representative will adequately protect the interests of the class, the court should ask whether the proposed class representative and her counsel have any conflicts of interest with any class member and whether the proposed class representative and her counsel will prosecute the action vigorously on behalf of the class. Johnson v. General Mills, Inc., 275 F.R.D. 282, 288 (C.D. Cal. 2011).

The Court is unaware of any actual conflicts of interest in this matter and no evidence in the record suggests that either Plaintiffs or Plaintiffs' counsel have a conflict with other class members. Plaintiffs' counsel have substantial experience in complex litigation and data breach class actions. (Plaintiffs' Counsel Decl. ¶¶ 30–37.) Accordingly, the Court concludes that Plaintiffs and Class Counsel will adequality represent the interests of the proposed class.

**B. Requirements of Rule 23(b)**

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 614 (1997). Here, Plaintiffs assert the Agreement satisfies the requirements of Rule 23(b)(3). (Motion at 22-24.)

Rule 23(b)(3) requires (1) issues common to the whole class to predominate over individual issues and (2) that a class action be a superior method of adjudication for the controversy. See Fed. R. Civ. P. 23(b)(3). As to predominance, the "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Hanlon, 150 F.3d at 1022 (quoting Amchem, 521 U.S. at 623). "[T]he examination must rest on 'legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.'" Id. (same). A class should not be certified if the issues of the case require separate adjudication of each individual class member's claims. Id.

The Court concludes that, for purposes of settlement, common questions regarding Crossroads' alleged misconduct and the resultant harm to Plaintiffs and Settlement Class Members predominate over individualized issues. Plaintiffs and Settlement Class Members share common questions of law and fact arising from the same April 2023 Security Incident and Defendant's security policies and response affected all Settlement Class Members in the same way. (Motion at 11.) The Court is satisfied that the common questions predominate.

A class action must also be superior to other methods of adjudication for resolving the controversy. Fed. R. Civ. P. 23(b)(3). To determine superiority, a court's inquiry is guided by the following pertinent factors:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D). However, "[confronted] with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present

intractable management problems . . . for the proposal is that there be no trial." Amchem, 521 U.S. at 620.

Here, Plaintiffs argue that "superiority is also satisfied because class-wide adjudication of the claims of all members of the Class would be judicially economical." (Motion at 12); see also In re PostMeds, 2024 WL 4894293, at *3 (holding that superiority was satisfied because the "judicial economy achieved through common adjudication makes class action a superior method for adjudicating the proposed class's claims."). Accordingly, the Court concludes that the superiority requirement is satisfied.

## V. SETTLEMENT AGREEMENT

The Court incorporates by reference the definitions provided in the Agreement; all terms defined therein shall have the same meaning in this order.

### A. The Settlement Class

The Settlement Agreement provides for the certification of a Settlement Class defined as: "all individuals residing in the United States to whom Defendants sent a notice concerning the Security Incident." (S.A. ¶ 1.34.) In total, there are an estimated 24,182 Settlement Class Members. (Id. ¶ 1.37.)

### B. Settlement Benefits

Under the Settlement Agreement, Crossroads will establish a non-reversionary common fund (the "Settlement Fund") of four hundred and twenty-five thousand dollars ($425,000.00). (Id. ¶ 1.39.) As described below, the Settlement Fund will pay for compensation for out-of-pocket losses, pro rata cash payments, and credit monitoring services. (Id. ¶¶ 1.21, 2.1–2.2.)

#### 1. Compensation for Out-of-Pocket Losses

Settlement Class Members may claim up to $1,000 per person for "out-of-pocket losses" which include, inter alia, expenses incurred because of the Security Incident, unreimbursed bank fees, phone charges, postage, gasoline for local travel, costs of credit reports, costs of credit monitoring, and the costs of identity theft insurance products. (Id. ¶ 2.1(b).)

#### 2. Pro Rata Cash Payments

Additionally, Settlement Class Members may claim a pro rata cash payment, estimated at $50 and capped at $300 per Settlement Class Member, determined by the value of the Settlement Fund after deducting approved claims for out-of-pocket losses, credit monitoring, the costs of Settlement Administration, approved attorney fees and costs, and the Service Awards. (Id. ¶ 2.1(b).)

### 3. Credit Monitoring

Settlement Class Members may also enroll in two (2) years of one-bureau credit monitoring provided by Epiq (the Settlement Administrator). (Id. ¶¶ 1.7, 2.2(a).)

### 4. Injunctive Relief

Crossroads will provide a confidential declaration to Class Counsel describing its information security enhancements since the Security Incident and estimating the annual cost of those enhancements. (Id. ¶ 2.2(b).) Critically, the cost of such enhancements will be paid by Crossroads *separate and apart* from all other settlement benefits. (Id.)

## C. The Proposed Settlement Administrator

The Parties recommend that Epiq be appointed as Settlement Administrator given its extensive experience in complex class actions. (Id. ¶ 1.32.)

## D. Notice

Notice shall be disseminated via postcards with detachable claim forms through First Class U.S. mail to Settlement Class Members. (Id. ¶ 4.2.) Defendant shall prepare and provide the Class List to the Settlement Administrator for Notice using information in its records. The Settlement Class List shall include the Settlement Class's names and current or last known addresses (if available). (Id. ¶¶ 1.36, 4.1.) Notice will also be provided on the Settlement Website—which will include all relevant Settlement documents. (Id. ¶ 4.6.) Additionally, when notices are undeliverable, the Settlement Administrator will locate updated addresses and resend notice. (Id. ¶ 4.4.) Thereafter, the Settlement Administrator will send reminder notices to each Settlement Class Member who has not submitted a claim. (Id. ¶ 4.5.)

## E. Opt-Outs

Any Settlement Class Members may opt-out of the Settlement Agreement by submitting a Request for Exclusion to the Settlement Administrator postmarked no later than 60 days after the Notice Deadline. (Id. ¶ 5.1.)

The Request for Exclusion must be personally signed by the Settlement Class member and contain the name, address, telephone number, and email address (if any), and include a statement indicating a request to be excluded from the Settlement Class. (Id.) Any individual in the Settlement Class who does not timely and validly request to opt out shall be bound by the terms of this Agreement even if he or she does not submit a Valid Claim. (Id.)

//
//

### F. Objections

Settlement Class Members may object to the Settlement Agreement by filing written objections with the Court and providing a copy to the Settlement Administrator no later than 60 days after the Notice Deadline. (Id. ¶¶ 5.2–5.3.) The written objection must include (i) the name of the proceedings; (ii) the Settlement Class Member's full name and current mailing address; (iii) a statement that states with specificity the grounds for the objection, as well as any documents supporting the objection; (iv) the identity of any attorneys representing the objector; (v) a statement regarding whether the Settlement Class Member (or his/her attorney) intends to appear at the Final Approval Hearing; and (vi) the signature of the Settlement Class Member or the Settlement Class Member's attorney. (Id.)

### G. Attorneys' Fees, Costs, Expenses, and Service Awards

As contemplated by the Settlement Agreement, Class Counsel will move for an award of attorney fees up to one-third (33.33%) of the Settlement Fund (i.e., $141,652.50) and for the reimbursement of costs and expenses of up to $20,000.00. (S.A. ¶ 11.1.) Additionally, Class Counsel will move for Service Awards of $5,000 per Class Representatives (i.e., $10,000 in total). (Id. ¶ 10.1.)

### H. Release

The Parties tailored the release provision to affect only those claims related to the Security Incident. (Id. ¶¶ 1.25–1.27, 9.1–9.2.)

## VI. PRELIMINARY APPROVAL OF THE SETTLEMENT

"[Rule 23] requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." Hanlon, 150 F.3d at 1026. To determine whether a settlement agreement meets these standards, the court considers a number of factors, including "the strength of the plaintiff's case, the risk, expense, complexity, and likely duration of further litigation, the risk of maintaining class action status throughout trial, the amount offered in settlement, the extent of discovery completed, and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement." Stanton, 327 F.3d at 959 (internal citations omitted). The settlement may not be a product of collusion among the negotiating parties. In re Mego Fin., Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000) (citing Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1290 (9th Cir. 1992)).

"At the preliminary approval stage, some of the factors cannot be fully assessed. Accordingly, a full fairness analysis is unnecessary." Litty v. Merrill Lynch & Co., 2015 WL 4698475, *8 (C.D. Cal. Apr. 27, 2015). Rather, the court need only decide whether the settlement is potentially fair, Acosta, 243 F.R.D. at 386, in light of the strong judicial policy in favor of settlement of class actions. Class Plaintiffs, 955 F.2d 1276. "[T]he court's intrusion

upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." Hanlon, 15 F.3d at 1027.

### A. Extent of Discovery and Stage of the Proceedings

For a court to approve a proposed settlement, "[t]he parties must . . . have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement." Acosta, 243 F.R.D. at 396 (internal quotation marks omitted). Here the parties engaged in fact-investigation through "robust informal discovery—which enabled the Parties to better evaluate the strengths and weaknesses of their respective claims and defenses." (Motion at 20.) "For example, the Parties exchanged information about the scope of the Security incident, Crossroads' response, the types of information impacted, and Crossroads' insurance policies (if any)." (Id.) The Agreement "was the product of adversarial, arms-length, and non-collusive negotiations." (Id. at 7.)

Settlements are presumed fair if they "follow sufficient discovery and genuine arms-length negotiation." Adoma v. Univ. of Phx., Inc., 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (quoting Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004)); Lewis v. Starbucks Corp., 2008 WL 4196690, at *6 (E.D. Cal. Sept. 11, 2008) ("[A]pproval of a class action settlement is proper as long as discovery allowed the parties to form a clear view of the strengths and weaknesses of their cases."). The Court finds each side has a clear idea of the strengths and weaknesses of its respective cases and concludes that the extent of discovery and the stage of proceedings weigh in favor of preliminary approval.

### B. Amount Offered in Settlement

In determining whether the amount offered in settlement is fair, a court compares the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation. In re Mego, 213 F.3d at 459.

The Agreement provides $425,000 for a class of 24,182, which equates to a value of $17.58 per Class Member. (Motion at 19.) Plaintiffs argue this supports approval because "other courts have approved settlements in privacy and security cases when each class member received just a few dollars or less." Carter v. Vivendi Ticketing US LLC, 2023 WL 8153712, at *5 (C.D. Cal. Oct. 30, 2023). Plaintiffs further argue the Agreement "provides more value per Class Member than analogous data breach settlements." (Motion at 19); see, e.g., In re Loandepot Data Breach Litig., No. 8:24-cv-00136 (C.D. Cal. Jan. 13, 2025) (approving a $25 million common fund for a class of 16,924,007 which equates to $1.48 per class member); In re 23andMe, 2024 WL 4982986 (approving a $30 million common fund for a class of approximately 6.4 million which equated to $4.69 per class member).

Although the settlement amount may represent a small fraction of the maximum value of this litigation, "'[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair.'" In re Mego, 213 F.3d at 459 (quoting Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 628 (9th Cir. 1982)). In In re Mego, the Ninth Circuit considered the difficulties in proving the case and determined the settlement amount, which was one-sixth of the potential recovery, was fair and adequate. Id. Given the difficulties posed to each individual of pursuing his or her claim, the Court finds the settlement amount is potentially fair.

**C. Strength of Case and Risk, Expense, Complexity, and Likely Duration of Litigation**

In the data breach context, evaluating the strength of a case is difficult because "there have been no data breach cases tried to verdict, and only a handful of cases have achieved class certification." In re PostMeds, 2024 WL 4894293, at *6 (internal citations and quotations omitted). Indeed, in PostMeds, the court approved a $7.5 million common fund settlement—even when the estimated full recovery was approximately $50 million. (Id.) Likewise, the strength of Plaintiffs' case is uncertain. (Motion at 18.)

Furthermore, the risk, expense, and complexity of further litigation is significant, and "[e]stimates of what constitutes a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years)." Schaffer v. Litton Loan Servicing, LP, 2012 WL 10274679, at *11 (C.D. Cal. 2012).

Plaintiffs argue that prosecuting this litigation further "poses substantial risks—especially in terms of establishing liability and damages." (Motion at 18.) "Additionally, class litigation poses substantial risks of denial or reversal of class certification . . . losing on summary judgment or at a jury trial . . . [or] revers[al] on appeal which would effectively extinguish any hope of recovery by the Settlement Class." (Id. (internal quotations omitted).)

The Court believes the risk, expense, and likely duration of further litigation weigh in favor of preliminary approval. Without the Agreement, the parties would be required to litigate class certification, as well as the ultimate merits of the case—a process which the Court acknowledges is long and expensive. Overall, these factors weigh in favor of preliminary approval.

**D. Experience and Views of Counsel**

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal citation and quotation marks omitted). Here, based on Class Counsel's experience in data breach class actions, "Class Counsel believes that this Settlement is a favorable result for Plaintiffs and Class Members." (Motion at 20.) Such a recommendation is significant because "[p]arties represented by

competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation" and "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." Harbour v. California Health & Wellness Plan, 2024 WL 171192, at *5 (N.D. Cal. Jan. 16, 2024) (quoting Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 967 (9th Cir. 2009) and In re Omnivision Techs., 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2009)). The Court finds this factor weighs in favor of preliminary approval.

### E. Collusion Between the Parties

"To determine whether there has been any collusion between the parties, courts must evaluate whether 'fees and relief provisions clearly suggest the possibility that class interests gave way to self interests,' thereby raising the possibility that the settlement agreement is the result of overt misconduct by the negotiators or improper incentives for certain class members at the expense of others." Litty, 2015 WL 4698475, at *10 (quoting Staton, 327 F.3d at 961).

As contemplated by the Settlement Agreement, Class Counsel will move for Service Awards of $5,000 per Class Representatives (i.e., $10,000 in total). (S.A. ¶ 10.1.) A court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for the time spent in litigation activities. See In re Mego, 213 F.3d at 463. "The Ninth Circuit has emphasized that district courts must 'scrutiniz[e] all incentive awards [and service awards] to determine whether they destroy the adequacy of the class representatives.'" In re Facebook Internet Tracking Litig., 2022 WL 16902426, at *13 (N.D. Cal. Nov. 10, 2022) (quoting Radcliffe v. Experian Info. Sols., 715 F.3d 1157, 1163 (9th Cir. 2013)). In doing so, courts consider "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." Staton v. Boeing Co., 327 F.3d 938, 977 (9th Cir. 2003). The Court will ultimately determine whether each service award is appropriate in light of each class representative's role and responsibilities. Because the proposed service awards are not per se unreasonable, the Court finds that this factor weighs in favor of preliminary approval. See Rodriguez, 563 F.3d at 958 (finding that "[i]ncentive awards are fairly typical in class action cases" and "are discretionary") (emphasis omitted). The Court instructs Plaintiffs, when they move for final approval, to provide declarations from each of the named Plaintiffs attesting to the efforts they undertook in furtherance of the litigation. See Radcliffe v. Experian Info. Sols. Inc., 715 F.3d 1157, 1165 (9th Cir. 2013) (stating that there is a "serious question whether [a] class representative[] could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement when [the class representative] would receive $5,000" in an incentive award).

As for attorneys' fees, Class Counsel will move for an award of attorney fees up to one-third (33.33%) of the Settlement Fund (i.e., $141,652.50) and for the reimbursement of costs and expenses of up to $20,000.00. (S.A. ¶ 11.1.) When deciding to award attorneys' fees and costs, the Court has discretion in a common fund case to choose either (1) the lodestar method or (2) the percentage-of-the-fund. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002). Under the percentage-of-recovery method, the Ninth Circuit has found that a benchmark of 25% of the common fund is a reasonable attorneys' fee award. Hanlon, 150 F.3d at 1029. In deciding

whether special circumstances justify a departure upward or downward from the 25% benchmark, courts typically consider (1) the size of the fund, (2) the quality of the results achieved, (3) the risk counsel undertook, (4) the skill required and the quality of work, (5) the contingent nature of the fee and the financial burden carried by the plaintiff, and (6) awards made in similar cases. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1048-50 (9th Cir. 2002). Here, Plaintiffs' counsel's fee award request is high. Plaintiffs must provide documentation and legal argument to support the reasonableness of their fee request at the time they move for final approval. However, the amount requested does not raise any concerns regarding collusion.

### F. Remaining Factors

In addition to the factors discussed above, the Court may consider the risk of maintaining class action status throughout the trial, the presence of a governmental participant, and the reaction of the class members to the proposed settlement. Staton, 327 F.3d at 959 (internal citations omitted). At this stage, the Court cannot fully analyze the remaining factors. For example, there is no governmental participant in this action. Additionally, the settlement class members have yet to receive notice of the settlement Agreement and have not had an opportunity to comment or object to its terms. The Court directs Plaintiffs, in their motion for final approval, to provide briefing on these issues.

On balance the factors support preliminary approval of the Agreement. The Agreement is potentially fair, adequate, and reasonable.

## VII.    CLASS NOTICE

Rule 23(c)(2)(B) requires that the Court "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

The Agreement selects Epiq as the Settlement Administrator because "Epiq is an industry leader in class action administration, having implemented more than a thousand successful class action notice and settlement administration matters" including many complex data breach cases. (See Azari Decl. ¶¶ 4-6.) Epiq will provide notice via a double Postcard Short Form Notice with detachable Claim Form ("Postcard Notice") through First Class U.S. mail. (Id. ¶ 22.) Epiq will also check mailing addresses against the National Change of Address ("NCOA") database maintained by the USPS. (Id. ¶ 23.) Additionally, Epiq will establish a toll-free telephone number and a Settlement Website (which will include the Long Form Notice, all relevant Settlement documents, and answers to frequently asked questions). (Id. ¶¶ 25-26.) Thereafter, Epiq will send Reminder Notices to all identified Settlement Class Members who have not filed claims. (Id. ¶ 29.) The Short Form Notice, Long Form Notice, and Claim Form are all attached as exhibits to the Agreement. (See Agreement.)

The Court finds that the form and content of the proposed Short Form Notice and Long Form Notice are reasonable and fair and adequately advise Settlement Class Members of the

terms of the proposed settlement; of their right to payment under the settlement; of their right to file a Request for Exclusion; of the preliminary court approval; of the timing and procedural requirements for excluding oneself from the Class and/or objecting to the settlement; and of the date of the final approval hearing.  Thus, the Court finds that the Notice Program clearly comports with all constitutional requirements, including those of due process.  The Court further finds that the notice plan constitutes an effective method of notifying Settlement Class Members of their rights with respect to this action and settlement.

## VIII.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Preliminary Approval.  The Court **ORDERS** as follows:

1. The Agreement is preliminarily approved as potentially fair, reasonable, and adequate for members of the settlement class.  However, in their motion for final approval, Plaintiffs shall address the concerns raised above.

2. The following Settlement Class is certified for settlement purposes only:

   All individuals residing in the United States to whom Defendant sent a notice concerning the Security Incident.

3. The Court appoints Scott Edelsberg of Edelsberg Law, P.A. and Raina Borrelli of Straus Borrelli PLLC to serve as counsel on behalf of the Settlement Class for purposes of settlement only.

4. Plaintiffs Omar Bolanos and Caren Luke are appointed as the representatives of the Settlement Class for purposes of settlement only.

5. The Court appoints Epiq as the settlement administrator.

6. The Court approves, as to form and content, the Short Form Notice, Long Form Notice, and Claim Form.

7. The Court approves the methods for giving notice of the Agreement to the Settlement Class, as stated in the Agreement and the Motion.

8. No later than 10 days after the entry of this Order, Defendant shall provide the Settlement Class List to the Settlement Administrator.

9. No later than 30 days after the entry of this Order, the Settlement Administrator shall issue Notice to the Settlement Class Members ("Notice Deadline").

10. The Objection Deadline shall be 60 calendar days after the Notice Deadline.

11. The Opt-Out Deadline shall be 60 calendar days after the Notice Deadline.

12. The Claim Form Deadline shall be 15 calendar days before the Final Approval Hearing.

13. The parties' briefs and other papers in support of final approval of the proposed settlement shall be filed with the Court no later than 28 days prior to the Final Approval Hearing.

14. The Final Approval Hearing shall be held on **Monday, November 17, 2025**, at 9:00 a.m. in Courtroom 1 of the United States District Court for the Central District of California, Eastern Division, located at 3470 12th Street, Riverside, California 92501. The Final Approval Hearing may be postponed, adjourned, transferred, or continued by order of the Court without further notice to Settlement Class Members. After the Final Approval Hearing, the Court may enter a Final Approval Order in accordance with the Settlement Agreement that will adjudicate the rights of all Settlement Class Members.

15. As of the date this Order is signed, all dates and deadlines associated with the Action shall be stayed, other than those pertaining to the administration of the settlement.

16. If for any reason the Court does not execute and file an order granting Final Approval of the Settlement, or if the Effective Date, as defined in the Settlement Agreement, does not occur for any reason whatsoever, the Settlement Agreement and all evidence and proceedings had in connection therewith shall be dismissed without prejudice to the status quo ante rights of the parties in this action, as set forth in the Settlement Agreement, and this Order shall be rendered null and void and shall be vacated.

17. The June 9, 2025 hearing is **VACATED**.

**IT IS SO ORDERED.**